**ROCKY MOUNTAIN OIL AND GAS ASSOCIATION, Plaintiff,**

**v.**

**Cecil D. ANDRUS, Secretary of the United States Department of the Interior, and Leo Krulitz, Solicitor of the United States Department of the Interior, Defendants,**

**and**

**Sierra Club, Natural Resources Defense Council, National Wildlife Federation, and Wilderness Society, Intervenors.**

**No. C78–265K.**

United States District Court, D. Wyoming.

Nov. 7, 1980.

Craig R. Carver and Pamela A. Ray of Head, Moye, Carver & Ray, Denver, Colo., and Houston G. Williams and Barry G. Williams of Williams, Porter, Day & Neville, Casper, Wyo., for plaintiff.

Charles E. Graves, U. S. Atty. for the District of Wyoming, Cheyenne, Wyo., and Caroline P. Osolinik and Steven A. Herman of the Land and Natural Resources Divi-

sion, Dept. of Justice, Washington, D. C., for defendants.

Laurens H. Silver of Sierra Club Legal Defense Fund, Inc., San Francisco, Cal., and John D. Wiener, Laramie, Wyo., for intervenors.

## MEMORANDUM OPINION

KERR, District Judge.

The dispute in this case involves several millions of acres of land which are to be considered for wilderness designation by Congress under the Federal Land Policy and Management Act, 43 U.S.C. § 1701, et seq. Jurisdiction is based on federal question, 28 U.S.C. § 1331(a). Some of the lands in question are located in Wyoming and therefore venue is properly invoked.

Plaintiff Rocky Mountain Oil and Gas Association (RMOGA) is a non–profit corporation serving as a trade association of 650 member companies. RMOGA members are involved in the exploration for, and development of, oil and gas. Defendant Cecil D. Andrus is the Secretary of the Interior and defendant Leo Krulitz is the Solicitor for the Department of the Interior. Intervenors are special interest groups concerned with the environment and wilderness protection.

The Federal Land Policy and Management Act (FLPMA) was enacted on October 21, 1976. FLPMA was the culmination of a Congressional attempt to provide comprehensive management of the public lands. Section 102, 43 U.S.C. § 1701, sets forth the Congressional policies of FLPMA. The portions of this section which are relevant to this suit read as follows:

> ... (2) the national interest will be best realized if the public lands and their resources are periodically and systematically inventoried and their present and future use is projected through a land use planning process coordinated with other Federal and State planning efforts ...
>
> ... (7) goals and objectives be established by law as guidelines for public land use planning, and that management be on the basis of multiple use

and sustained yield unless otherwise specified by law;

> (8) the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use ...
>
> ... (11) regulations and plans for the protection of public land areas of critical environmental concern be promptly developed;
>
> ... (12) the public lands be managed in a manner which recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber from the public lands ...
>
> ... (b) The policies of this Act shall become effective only as specific statutory authority for their implementation is enacted by this Act or by subsequent legislation and shall then be construed as supplemental to and not in derogation of the purposes for which public lands are administered under other provisions of law.

FLPMA's policy directives clearly attempt to strike a balance between the development of mineral resources and environmental concerns. A thorough reading of the entire Act and a study of the complete legislative history supports this analysis.

Pursuant to Section 603, 43 U.S.C. § 1782, the Secretary of the Interior (Secretary) is to inventory the public lands to determine whether or not the lands are suitable to be set aside as wilderness:

> § 1782. *Bureau of Land Management Wilderness Study–Lands subject to review and designation as wilderness*
>
> (a) Within fifteen years after October 21, 1976, the Secretary shall review those roadless areas of five thousand acres or more and roadless islands of the public lands, identified during the inventory re-

quired by section 1711(a) of this title as having wilderness characteristics described in the Wilderness Act of September 3, 1964 and shall from time to time report to the President his recommendation as to the suitability or non–suitability of each such area or island for preservation as wilderness: Provided, That prior to any recommendations for the designation of an area as wilderness the Secretary shall cause mineral surveys to be conducted by the Geological Survey and the Bureau of Mines to determine the mineral values, if any, that may be present in such areas: Provided further, That the Secretary shall report to the President by July 1, 1980, his recommendations on those areas which the Secretary has prior to November 1, 1975, formally identified as natural or primitive areas. The review required by this subsection shall be conducted in accordance with the procedure specified in section 3(d) of the Wilderness Act.

*Presidential recommendation for designation as wilderness*

(b) the President shall advise the President of the Senate and the Speaker of the House of Representatives of his recommendations with respect to designation as wilderness of each such area, together with a map thereof and a definition of its boundaries. Such advice by the President shall be given within two years of the receipt of such report from the Secretary. A recommendation of the President for designation as wilderness shall become effective only if so provided by an Act of Congress.

*Status of lands during period of review and determination*

(c) During the period of review of such areas and until Congress has determined otherwise, the Secretary shall continue to manage such lands according to his authority under this Act and other applicable law in a manner so as not to impair the suitability of such areas for preservation as wilderness, subject, however, to the continuation of existing mining and grazing uses and mineral leasing in the manner and degree in which the same was being conducted on October 21, 1976:

Provided, That in managing the public lands the Secretary shall by regulation or otherwise take any action required to prevent unnecessary or undue degradation of the lands and their resources or to afford environmental protection. Unless previously withdrawn from appropriation under the mining laws, such lands shall continue to be subject to such appropriation during the period of review unless withdrawn by the Secretary under the procedures of section 1714 of this title for reasons other than preservation of their wilderness character. Once an area has been designated for preservation as wilderness, the provisions of the Wilderness Act which apply to national forest wilderness areas shall apply with respect to the administration and use of such designated areas including mineral surveys required by section 4(d)(2) of the Wilderness Act, and mineral development, access, exchange of lands, and ingress and egress for mining claimants and occupants.

The section mandates three phases in the inventory process. The first step is to identify roadless areas of 5,000 acres or more or any islands which have wilderness characteristics. The second step involves a review of the lands to compare mutiple use values. The final step is to make a recommendation to the President regarding the best use for the lands.

The Solicitor of the Department of the Interior (Solicitor) is charged with the responsibility of insuring that interpretations, guidelines, rules and regulations issued pursuant to the authority of FLPMA are in compliance with the law. (Stipulation of Facts).

In September of 1978, the Solicitor issued a legal opinion interpreting § 603 of FLPMA in relation to the entire Act, as well as interpreting the section on its face. The Solicitor's opinion is considered to be the law of the Department of the Interior (Interior) and the Bureau of Land Management (BLM) on both the federal and state levels. In effect, the opinion sets the policy and philosophy of BLM in this area. Although the Solicitor's opinion is binding on

Interior and the BLM, it sets no precedent for this court. In accordance with the opinion, a Wilderness Inventory Handbook was issued on September 30, 1978. The handbook set forth the policies and procedures to implement the Solicitor's opinion. Under the directive of the handbook, the inventory was to consist of two phases: The initial phase was a cursory examination of the lands to see which ones clearly and obviously lacked wilderness characteristics. This phase was completed by September 30, 1979. The second phase, which was completed by September 30, 1980, consisted of a more intensive inventory. Areas of the public lands which were determined to have wilderness characteristics were to be identified as Wilderness Study Areas (WSA's). The WSA's will be reviewed by the BLM prior to the recommendations made to the President. As a result of the inventories, 10,057,000 acres are proposed to be included in WSA's and 10,670,000 acres have already been placed in WSA's. Further instructions were handed down to all BLM offices in the form of Interim Management and Policy Guidelines for Wilderness Review (IMPS).

Plaintiff RMOGA challenges the Solicitor's opinion and ensuing regulations and guidelines as contrary to law, arbitrary, capricious and completely erroneous.

In essence, the Solicitor's opinion, the Wilderness Inventory Handbook, and IMPS promulgated thereunder, state that the issue under Section 603 is whether or not development which would impair the suitability of an area for preservation as wilderness can be permitted in an area which may eventually be designated as wilderness. The Solicitor's answer is negative. The conclusion reached is that actions which have even a remote possibility of impairing an area's suitability for wilderness designation are not allowable because "the agency cannot permit the possible wilderness characteristics to be destroyed before those characteristics have been determined to exist." As a result of this analysis, mineral development in these potential wilderness areas has virtually ceased.

The Solicitor's opinion relies heavily on *Parker v. United States*, 309 F.Supp. 593 (D.Colo.1970), aff'd 448 F.2d 793 (10th Cir.

1971), for authority. Such reliance is misplaced. The Parker case involved timber harvesting and is distinguishable on its facts. Although this alone would be sufficient to condemn the Solicitor's misplaced reliance on Parker, the Senate Committee report specifically states that the language of Section 201(a) of FLPMA was included to bar suits similar to *Parker v. United States*, S.Rep. No. 873, 93rd Cong., 2d Sess. 36 (1974).

■ The initial question to be considered by this court is the issue of ripeness. Defendants take the position that the Solicitor's opinion is not final agency action with respect to wilderness administration by the BLM. They further argue that the latest IMP, adopted on December 12, 1979, is the reference to be followed and all earlier IMPS are superceded and therefore are to be disregarded. In its brief, the government argues that the relief sought by RMOGA is one of pre–enforcement of the final IMP. Why the government would adopt this position is difficult for the court to understand. The Solicitor's opinion is in full force and effect and is considered to be policy and regulation for the BLM. (Stipulation of Facts). The IMP is simply a set of rules and regulations for the application of the policy expressed in the Solicitor's opinion. Enforcement of the Solicitor's opinion has been continual since it was written.

■ In *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681, the Supreme Court established a test for determining the ripeness of a case for judicial review. Two requirements must be met. The first requirement is to determine if the issue to be decided is a purely legal one. The second requirement is a determination of whether or not there is a true hardship to the parties if court consideration is withheld.

The issue to be decided in this case falls squarely into the first requirement of Abbott Laboratories. Counsel for both sides have stipulated the facts. The question is purely one of statutory interpretation. Congressional intent is argued by both sides. Motions for summary judgment

have been filed by both sides and, at the hearing held by this court to consider the motions, both sides agreed that the issue is one of law. The Supreme Court was confronted with a similar situation in Abbott Laboratories and the Court had this to say:

> The problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.
>
> As to the former factor, we believe the issues presented are appropriate for judicial resolution at this time. First, all parties agree that the issue tendered is a purely legal one: whether the statute was properly construed by the Commissioner to require the established name of the drug to be used *every time* the proprietary name is employed. Both sides moved for summary judgment in the District Court, and no claim is made here that further administrative proceedings are contemplated. It is suggested that the justification for this rule might vary with different circumstances, and that the expertise of the Commissioner is relevant to passing upon the validity of the regulation. This of course is true, but the suggestion overlooks the fact that both sides have approached this case as one purely of congressional intent, and that the Government made no effort to justify the regulation in factual terms.

The second requirement of hardship to the parties through lack of court consideration is also present. Many of RMOGA's members hold leases on the federal lands in question. Others are interested in acquiring leases. Irreparable financial harm is accruing to RMOGA's members through the implementation of the Solicitor's opinion and ensuing regulations because of the loss of monies previously invested and the halting of oil and gas exploration and development.

The government argues that final agency action has not occurred or alternatively that only actions taken under the last IMP are available for review. Such an argument is without merit. To adopt such a position would be to allow agencies to sidetrack indefinitely any judicial review by simply promulgating more rules and regulations ad infinitum, all the while continuing to claim that no final agency action has been taken. In describing "final agency action" in the Abbott Laboratories case, the Court stated:

> ... the regulations in issue we find to be "final agency action" within the meaning of § 10 of the Administrative Procedure Act, 5 U.S.C. § 704, as construed in judicial decisions. An "agency action" includes any "rule," defined by the Act as "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy," §§ 2(c), 2(g), 5 U.S.C. §§ 551(4), 551(13). The cases dealing with judicial review of administrative actions have interpreted the "finality" element in a pragmatic way ...
>
> ... The regulation challenged here, promulgated in a formal manner after announcement in the Federal Register and consideration of comments by interested parties is quite clearly definitive. There is no hint that this regulation is informal, see *Helco Products Co. v. McNutt*, 78 U.S.App.D.C. 71, 137 F.2d 681, or only the ruling of a subordinate official, see *Swift & Co. v. Wickham*, 230 F.Supp. 398, 409, aff'd, 364 F.2d 241, or tentative. It was made effective upon publication, and the Assistant General Counsel for Food and Drugs stated in the District Court that compliance was expected.

The facts in the instant case are clearly on "all fours" with the description given by the Court. The Solicitor's opinion and subsequent regulations are certainly statements of law and policy, effective upon publication. (Stipulation of Facts). The utter futility of plaintiff RMOGA's position is evident. Further agency action would be virtually worthless because the standards set forth in the Solicitor's opinion are all encompassing. The agencies are to act according to what the Solicitor says. (Stipulation of Facts). Even if leases are given to RMOGA's members, any development of the leases is not allowed due to the Solicitor's narrow interpretation of Section 603(c) of FLPMA. The same legal issues would be presented as are before the court

now even if further agency action was taken. See *NLRB v. Marine Workers*, 391 U.S. 418, 88 S.Ct. 1717, 20 L.Ed.2d 706 (1968); *Martinez v. Richardson*, 472 F.2d 1121 (10th Cir. 1973); *Bendure v. United States*, 554 F.2d 427 (Ct.Cl. 1977).

5 U.S.C. § 706 sets the standard of review for this court when examining the Solicitor's opinion:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
>
> ... (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
>> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>>
>> (B) contrary to constitutional right, power, privilege, or immunity;

A close look at Section 603 of FLPMA, particularly 603(c), reveals that the statutory construction set forth in the Solicitor's opinion is clearly erroneous and will not support the policy set forth. The statute is clear and unequivocal on its face. § 603 of FLPMA requires that the Solicitor's opinion be set aside.

Although there would appear to be no question that two standards of environmental protection (non–impairment and unnecessary or undue degradation) are set up by § 603(c), the real issue in this case is the meaning of the clause" ... *subject, however, to the continuation of existing mining and grazing uses and mineral leasing in the manner and degree in which the same was being conducted on October 21, 1976 ...*" The words "continuation", "leasing" and "manner and degree" are critical in interpreting this statute. The Solicitor's opinion failed to give sufficient emphasis to these words. Not only are the words insufficiently emphasized, they are negated by the interpretation and policy enunciated by the Solicitor. The court notes that the meaning of the word "continuation" is "ongoing." Furthermore, if Congress had truly intended that only those leases issued as of October 21, 1976 be allowed to exist, then Congress would have used the word "leases", a noun, and not the verb "leasing." A verb equates with action. The clause does *not* read "subject, however, to the continuation of existing mining and grazing uses and mineral leases", but rather reads "mineral leasing." The term "manner and degree" lends further credence to this interpretation. If only existing uses as of October 21, 1976 were contemplated, the insertion of two standards of environmental protection would have been unnecessary and redundant.

■ Although the non–impairment standard affords the Secretary and the BLM a relatively stringent standard, a review of FLPMA clearly indicates concern over several national policies and interests. Conflicts between policies such as development of minerals and environmental protection are bound to occur. One policy should not suffer for the benefit of another. Compromises must be worked out. The Solicitor's opinion leaves no room for compromise. Mineral development is completely and totally sacrificed for environmental concerns. Such a policy is statutorily erroneous and therefore is clearly contrary to expressed Congressional intent.

The government cites *Utah v. Andrus*, 486 F.Supp. 995 (D.C.Utah 1979) as contra to this court's interpretation of § 603 of FLPMA. The court in the Utah case was concerned with access to school land grant lands and was not concerned with mineral leasing in wilderness study areas. Thus, the Utah case is distinguishable on its facts.

■ Deference is generally given to the statutory interpretation of those who are to administer the statute. *Udall v. Tallman*, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Red Lion Broadcasting v. FCC*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); *State of Utah v. Andrus*, 486 F.Supp. 995 (D.C.Utah 1979). However, when the interpretation given is contrary to the statute and therefore to Congressional intent, the interpretation will not be upheld. The Solicitor's opinion in effect ne-

gates the exception in § 603(c). The non-impairment standard has been so strictly applied that oil and gas exploration and development have come to a virtual halt in wilderness study areas. It was suggested by counsel for the government that the oil companies resort to directional drilling to solve their problems with the non-impairment standard. Such a proposed solution only discloses how woefully inadequate the government's understanding of the oil and gas industry is. The suggestion is ludicrous and totally unnecessary if the proper interpretation of Section 603(c) is given.

Sections 701(a) and 701(h), 43 U.S.C. § 1701 note, of FLPMA state:

Sec. 701. (a) Nothing in this Act, or in any amendment made by this Act, shall be construed as terminating any valid lease, permit, patent, right-of-way, or other land use right or authorization existing on the date of approval of this Act. (h) All actions by the Secretary concerned under this Act shall be subject to valid existing rights.

The Solicitor's opinion and the prevailing philosophy which ensued fly directly in the face of § 701 of FLPMA which states that no existing right is to be destroyed. Through implementation of the Solicitor's opinion, the BLM has, by its actions, entirely negated this statutory provision. The non-impairment standard is used as a justification to prevent lessees from exploring for and producing oil and gas.

■ Pre–FLPMA leases have become "shell" leases. Due to the non-impairment standard as defined by the Solicitor's opinion, Wilderness Handbook, and IMP's, little or no exploration and drilling are permitted because of potential environmental impairment. With one hand the government refuses to permit drilling and exploration and at the same time extends the other hand to collect lease rentals. Such a position cannot be condoned by this court. The statutory provision of FLPMA which provides that existing rights shall not be terminated is completely negated by the Solicitor's opinion. The government argues that leasing is discretionary and that leases are subject to rules and regulations. Although these statements are true, regulations which regulate to the extent of destruction of an existing right are arbitrary, capricious and clearly against Congressional intent. A lease without developmental rights is a mockery of the term "lease".

Pre–FLPMA leases may or may not be given a "suspension" under the Mineral Lands Leasing Act, 30 U.S.C. § 209. The effect of the suspension, if a lessee can even get one, is simply to delay the problem. If a WSA is declared wilderness, under the Solicitor's opinion, no development would be allowed. The end result is the same. A valid, existing right is completely and totally destroyed. There is nothing in FLPMA which would indicate that the Secretary, through his Solicitor, has been given such a power. All indications are to the contrary.

■ Leases issued after 1978 in areas under wilderness study were accompanied by Wilderness Protection Stipulations (WPS). The stipulation informs the lessee that the area under the lease is a potential wilderness area, subject to the non-impairment standard. The government argues that the inclusion of the WPS with the lease informs the lessee that development may or may not be allowed. Such an argument is a poor excuse for the end result. Once again a lessee could continue to pay rentals and not be allowed to develop oil and gas. Without the production of oil and gas, the lease will expire at the end of its primary term. The Secretary has allowed suspensions pursuant to § 39 of the Mineral Leasing Act of 1920 for a few leases. Suspensions are rarely, if ever, granted to leases accompanied by WPS's. Such a system of issuing "shell" leases with no developmental rights is clearly an unconstitutional taking and is blatantly unfair to lessees. Furthermore, the end result is clearly contrary to Congressional intent. With one hand the government issues a lease to superficially comply with the Congressional mandate of mineral production, and with the other hand implements a Solicitor's opinion which completely prevents effective mineral development.

Section 102(b) states that it is Congressional policy that FLPMA be supplemental to and not in derogation of purposes under other laws administering the public lands. The section specifically states:

(b) The policies of the Act shall become effective only as specific statutory authority for their implementation is enacted by this Act or by subsequent legislation and shall then be construed as supplemental to and not in derogation of the purposes for which public lands are administered under other provisions of law.

There is no question that Congress has more than one policy regarding the public lands. Each side in this case can point to a specific Act which supports mineral development or strict environmental policy. It is clear to the court that one policy should not displace the other. The Solicitor's opinion, the Wilderness Inventory Handbook and the IMP's do just that. Energy and resource development are critical to this country at this point in time and the erroneous interpretation of the law as given by the Solicitor is not only clearly contrary to the law as enacted by Congress, it is also counterproductive to public interest. In essence, the Solicitor's opinion is not only contrary to other public lands laws enacted by Congress, but is also contrary to other provisions of FLPMA itself, such as Section 102, infra.

One of the most interesting aspects of the case at bar is that the means used to achieve the goal are far more strict than the end result. The Wilderness Act itself has provisions for mineral development and states in pertinent part:

. . . (3) Notwithstanding any other provisions of this chapter, until midnight December 31, 1983, the United States mining laws and all laws pertaining to mineral leasing shall, to the same extent as applicable prior to September 3, 1964, extend to those national forest lands designated by this chapter as "wilderness areas"; subject, however, to such reasonable regulations governing ingress and egress as may be prescribed by the Secretary of Agriculture consistent with the use of the land for mineral location and development and exploration, drilling,

and production, and use of land for transmission lines, waterlines, telephone lines, or facilities necessary in exploring, drilling, producing, mining, and processing operations, including where essential the use of mechanized ground or air equipment and restoration as near as practicable of the surface of the land disturbed in performing prospecting, location, and, in oil and gas leasing, discovery work, exploration, drilling, and production, as soon as they have served their purpose.

. . . Mineral leases, permits, and licenses covering lands within national forest wilderness areas designated by this chapter shall contain such reasonable stipulations as may be prescribed by the Secretary of Agriculture for the protection of the wilderness character of the land consistent with the use of the land for the purposes for which they are leased, permitted, or licensed. Subject to valid rights then existing, effective January 1, 1984, the minerals in lands designated by this chapter as wilderness areas are withdrawn from all forms of appropriation under the mining laws and from disposition under all laws pertaining to mineral leasing and all amendments thereto.

In essence, defendants would have this court agree with a statutory interpretation that imposes a stricter standard and duty on lessees than the Wilderness Act (which is the goal) itself imposes. This court declines to condone such an anomolous position.

The legislative history of the Wilderness Act clearly demonstrates Congressional intent that the public lands should be utilized for multiple uses. Mineral development is obviously a primary concern and goal. An effort to remove wilderness lands from mineral development was made in 1973, but the effort never got past the committee stage because it was so blatantly contradictory to Congressional intent and national necessity. See *Mountain States Legal Foundation v. Andrus*, 499 F.Supp. 383, Case No. C78–165, U.S. District Court for the District of Wyoming, decided October 10, 1980. As Judge Brimmer concluded in the Mountain States case, "It would surely

be inconsistent with that intent to conclude that although lands in designated and approved wilderness areas are subject to oil and gas leasing until December 31, 1983 that lands merely under administrative study for a proposed wilderness area may be effectively withdrawn from leasing without the consent of Congress."

■ The same analysis is applicable in the present case although the legal issue is somewhat different. After reading the Wilderness Act, there is little doubt that Congressional intent is to keep lands already designated as wilderness areas open to oil and gas leasing until at least December 31, 1983.

The defendants and intervenors argue that this court should assume the ludicrous position that since the mineral provisions of the Wilderness Act extend "only" until December 31, 1983 and FLPMA's wilderness provisions continue until 1991, we should ignore the Wilderness Act. Defendants and intervenors further argue that the enactment of FLPMA post–dates that of the Wilderness Act. This court rejects the position advocated by defendants and intervenors. To do so would not only completely ignore the statutes in question, but would destroy the intent of the Congress.

The legislative history of Section 603 can be selectively read to support the viewpoint of either plaintiffs or defendants. This court has held that the statute is clear and unambiguous on its face and therefore resort to legislative history is unnecessary.

From the foregoing, summary judgment will be entered on behalf of the plaintiffs in accordance with this memorandum opinion.