# Presidential Authority Over Wilderness Areas Under the Federal Land Policy and Management Act of 1976

Under the Federal Land Policy and Management Act of 1976 (FLPMA), the President is required to forward to the Congress his recommendations with respect to federal lands studied by the Bureau of Land Management for possible designation as wilderness. He has no authority to refuse to make recommendations for areas he believes unsuitable for wilderness designation, or to return such lands to multiple use management without congressional action upon his recommendation. Under the FLPMA, as under the Wilderness Act of 1964, only Congress has authority to determine whether an area should or should not be designated as wilderness.

January 11, 1982

## MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

We have been asked by the Office of Legislative Affairs for our views concerning whether § 603 of the Federal Land Policy and Management Act of 1976 (FLPMA), 43 U.S.C. § 1782 (1976), authorizes the President to determine that areas being studied for wilderness designation are not suitable for such designation and to return such areas to general use management without congressional action.

This question has arisen as a result of a proposal by the Department of the Interior urging the President unilaterally to take such action with respect to the Shoshone Pygmy Sage area either in the form of a presidential executive order or a memorandum from the President. An executive order would have to be submitted to the Attorney General for consideration as to both form and legality prior to submission to the President. Exec. Order No. 11030, 3 C.F.R. 610 [1959-1963 Comp.], as amended. Interior has not articulated a legal rationale for suggesting a memorandum rather than an executive order. However, a memorandum contemplating action of this nature certainly implicates the Attorney General's responsibility to provide legal advice to the President, 28 U.S.C. § 509 (1976), on issues relative to the President's constitutional obligation "to take Care that the Laws be faithfully executed." U.S. Const., Art. II, § 3. Therefore, since your legal advice will be sought with respect to this matter irrespective of the procedure contemplated, these views are submitted directly to you.

We do not believe that the President has the legal authority to take the action being suggested by the Department of the Interior. We believe that he must forward to the Congress his recommendations as to whether land should or should not be designated as wilderness and that he cannot remove land from

consideration for such designation and return it to multiple use management by unilateral action.[1]

## I. Background

The FLPMA, 43 U.S.C. §§ 1701-1782 (1976), was an attempt to establish a coherent, comprehensive scheme of federal land management based on multiple use and sustained yield. *Id.*, § 1701(a)(7). In order to effect this goal, the FLPMA required the Secretary of the Interior (Secretary) to prepare and maintain on a continuing basis an inventory of all federal lands. *Id.*, § 1711. Based on lands identified in the inventory, the Bureau of Land Management (BLM) is required to conduct a study of all areas with wilderness characteristics. *Id.*, § 1782.[2] The Secretary must, as the studies are completed, make recommendations to the President as to the suitability or non-suitability of each area for permanent designation as a wilderness. *Id.*, § 1782(a). The President is then required to forward to the Congress "his recommendations with respect to designation as wilderness of each such area. . . ." *Id.*, § 1782(b). The statute explicitly states how the land is to be managed in the interim between the beginning of the study period and the final decision, a period that may last years.

> During the period of review of such areas and until Congress has determined otherwise, the Secretary shall continue to manage such lands . . . in a manner so as not to impair the suitability of such areas for preservation as wilderness. . . .

*Id.*, § 1782(c).

## II. Dispute Over the FLPMA, § 603, 43 U.S.C. § 1782

In September of this year, an Associate Solicitor Designate of Interior submitted a memorandum (Memorandum) to the Secretary concluding that the President has the discretion to release land he deems unsuitable for wilderness designation to multiple use management without congressional action.[3] Although conceding that § 603 did not give the President this authority explicitly, the Memorandum concluded that the "better conclusion" is that § 603 implicitly granted the President that authority. The Memorandum concluded that the President need forward to Congress only those recommendations that favor wilderness designation of areas under study. It expressed the view that unilateral presidential action to release land under review to multiple use management if the President determined that such land was not suitable for wilderness designation was consistent with congressional intent.

---

[1] Multiple use management is defined in 43 U.S.C. § 1702(c) to include "a combination of balanced and diverse resource uses . . . including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values."

[2] Wilderness is defined in 16 U S.C § 1131(c) (1976)

[3] Memorandum for Secretary Watt from Associate Solicitor Designate Good, Sept. 4, 1981

The Land and Natural Resources Division of the Department of Justice (Lands) disagrees with this analysis.[4] It concludes that the statute requires the President to forward recommendations on all areas that have been studied, whether or not the recommendations favor wilderness designations. Lands believes that Congress has retained for itself the authority to determine whether or not an area should be designated as wilderness.

Your advice may be requested because of your duty to resolve interagency legal disputes, Exec. Order No. 12146, 3 C.F.R. 409 (1980), *reprinted in* 28 U.S.C. § 509 note (Supp. V 1981), your duty to advise the President on the interpretation of the laws, 28 U.S.C. § 509, or to approve Presidential Executive Orders for legality. Exec. Order No. 11030, 3 C.F.R. 610 (1959–1963 Comp.), as amended. After a careful examination of § 603, its legislative history and prior administrative practice, we have concluded that the President must forward recommendations to Congress on all areas of land studied. We believe that the President does not have the authority to return lands to multiple use management without congressional action.

### III. Analysis

The central issue is whether Congress intended the President to forward to it recommendations on all areas with wilderness characteristics that had been studied by BLM. The pertinent language of the statute is:

> (a) [T]he Secretary shall review those roadless areas of five thousand acres or more and roadless islands of the public lands . . . having wilderness characteristics . . . and shall from time to time report to the President his recommendation as to the suitability or nonsuitability *of each such area* or island for preservation as wilderness. . . .
>
> (b) The President shall advise the President of the Senate and the Speaker of the House of Representatives of his recommendations with respect to designation as wilderness *of each such area.* . . . A recommendation of the President for designation as wilderness shall become effective only if so provided by an Act of Congress.
>
> (c) During the period of review *of such areas* and until Congress has determined otherwise, the Secretary shall continue to manage such lands . . . in a manner so as not to impair the suitability *of such areas* for preservation as wilderness. . . .

43 U.S.C. § 1782 (emphasis added). The parallel construction of the statute leads us to conclude that Congress was referring, in each subsection, to the same

---

[4] Memorandum for Attorney General French Smith and Deputy Attorney General Schmults from Assistant Attorney General Dinkins, Dec. 21, 1981

areas of land—those studied by BLM for possible designation as wilderness.[5] For each such area the Secretary must prepare recommendations, the President must prepare recommendations, and the Secretary must, "until Congress has determined otherwise," continue to manage such areas "so as not to impair the suitability of such areas for preservation as wilderness." *Id.*, § 1782(c). There is nothing on the face of the statute which provides the President with any explicit authority to refuse to make recommendations for areas he believes unsuitable for wilderness designation or to release those lands for multiple use management without congressional action. A natural reading of the statute does not supply an inference that the President was given such authority and prior administrative practice is to the contrary.

The language in § 603 regarding transmission of recommendations is virtually identical to that found in the Wilderness Act of 1964. 16 U.S.C. § 1132(c) (1976).[6] The Wilderness Act of 1964 directed the Secretary to review "every roadless area" of 5,000 or more acres in the national park system and the national wildlife refuges and game reserves in order to identify those with wilderness characteristics. *Id.* The statute requires the Secretary to report to the President his recommendations "as to the suitability or nonsuitability of each such area" and the President to report to Congress "his recommendations with respect to designation as wilderness of each such area. . . ." *Id.* In applying this provision, at least three previous Presidents have interpreted it to require them to forward all recommendations to Congress, including those recommending against designation of certain areas as wilderness.[7] Since the FLPMA's wilderness review provisions are directed towards all the lands within the Secretary's custody that are not covered by the Wilderness Act of 1964, the vast "public lands" administered by BLM, it is unlikely that Congress, adopting the same statutory language for the same executive department, intended to change the process.[8] When Congress enacts a new law incorporating language contained in another law on the same subject with full awareness of administrative practice under the prior law, it would require compelling evidence to conclude that Congress intended to alter the process—especially in a direction which would reduce congressional power. *Lorillard* v. *Pons*, 434 U.S. 575, 580–81 (1978); *Chemehuevi Tribe* v. *FPC*, 420 U.S. 395, 408–10 (1975); *Commissioner* v. *Estate of Noel*, 380 U.S. 678, 682 (1965).

---

[5] This parallel construction is even more evident in an earlier version of the bill, H.R. 5622, 94th Cong., 1st Sess., 121 Cong Rec 8999 (1975), introduced by Rep. Seiberling. Section 103 of H.R. 5622 was an almost verbatim version of § 603 except that it was written as one long paragraph, rather than three subsections.

[6] "[T]he Secretary of the Interior      shall report to the President his recommendation as to the suitability or nonsuitability of each such area or island for preservation as wilderness The President shall advise the President of the Senate and the Speaker of the House of Representatives of his recommendation with respect to the designation as wilderness of each such area or island   ." 16 U.S.C. § 1132(c).

[7] These actions by Presidents Ford, Nixon, and Johnson are reflected in the following material: Letter of Transmittal from President Ford, Dec 4, 1974, Public Papers of Gerald R Ford, at 709–10, Letter of Transmittal from President Nixon, June 13, 1974, Public Papers of Richard Nixon, at 496; Memorandum to the Congress from President Nixon, Nov 28, 1973, Public Papers of Richard Nixon, at 985; Letter of Transmittal from President Nixon, Apr. 28, 1971, Public Papers of Richard Nixon, at 592; Letter of Transmittal from President Johnson, Jan. 18, 1969, Public Papers of Lyndon B. Johnson, at 1365.

[8] Public lands, 43 U S C. § 1702(e), constitute the vast majority of the lands overseen by Interior.

Taken as a whole, therefore, we believe that § 1782 establishes a scheme whereby the Executive Branch supplies recommendations and data for Congress for a congressional decision as to each area. Until a congressional determination is made, the Secretary is required to manage such land "so as not to impair the suitability of such areas for preservation as wilderness." 43 U.S.C. § 1782(c).

This plain reading of § 603 is supported by the available legislative history. Both the House and Senate versions of the FLPMA, H.R. 13777 and S. 507, had wilderness review sections. The Senate's version, S. 507, § 103(d), was very short and ordered reviews to be done in accord with the Wilderness Act of 1964.

> (d) Areas identified pursuant to section 102 as having wilderness characteristics shall be reviewed within fifteen years of enactment of this Act pursuant to the procedures set forth in subsections 3(c) and (d) of the [Wilderness Act of 1964, 16 U.S.C. § 1132(c), (d).]

S. 507, § 103(d), *reprinted in* S. Rep. No. 583, 94th Cong., 1st Sess. 5 (1975). The sectional analysis states:

> Subsection (d) . . . provides that once these areas are identified *the Secretary must study them* to determine whether or not they are suitable for inclusion in the National Wilderness Preservation System *and submit his recommendations to the President, who, in turn, must submit his own recommendations to the Congress.*

*Id.* at 46 (emphasis added).[9]

The House version, H.R. 13777, § 603, was longer, in large part because it repeated in full the language of the Wilderness Act of 1964. *Compare* 16 U.S.C. § 1132(c) *with* 43 U.S.C. § 1782(a)–(c). When, in preparation for the conference committee, the Senate staff prepared a Committee Print attempting to merge S. 507 and H.R. 13777, it adopted the expanded language of the House's version, § 603,[10] and it was this language that was ultimately adopted by Congress.

The Committee Print highlighted proposed § 603(d) as the one provision of § 603 which differed from the Senate's version.[11] This subsection stated:

> Where the President recommends *pursuant to subsection (b)* of this section that a roadless area or island is not suitable for inclusion in the National Wilderness Preservation System, that recommendation shall take effect [unless vetoed within 120 days by one House.]

*Id.* at 857.

---

[9] The identical analysis was provided on an earlier version of the bill, S. 424. *See* S Rep. No. 873, 93rd Cong., 2d Sess. 38 (1974) (§ 103(e))

[10] *See* Staff of Senate Comm. on Energy and Natural Resources, 95th Cong , 2d Sess., *Legislative History of the Federal Land Policy and Management Act of 1976,* at 747 (Comm. Print 1978).

[11] *Id* at 857 The House version was originally § 311(d) but was renumbered as § 603 by the Senate staffers compiling the Committee Print. *See* n 10 *supra*

This language makes it manifest that the President was expected to make recommendations under § 603(b) for areas he believed unsuitable for wilderness designation as well as for those he believed suitable. The difference was that the House version would have allowed the President's recommendation regarding areas he regarded as unsuitable to become effective absent an affirmative vote by one House.[12] This understanding is reflected in the House Report. "Subsection (d) provides options whereby areas which the President has recommended as being non-suitable as wilderness either can be restored with minimum delay to full multiple-use management or considered further by the Congress for possible inclusion in the National Wilderness Preservation System." H.R. Rep. No. 1163, 94th Cong., 2d Sess. 17 (1976) (§ 311(d)). *See also* 122 Cong. Rec. 24701 (1976) (remarks of Sen. Jackson).

In the conference, Rep. Seiberling objected to language in § 603(c) and to all of § 603(d). Transcript of Conference Committee on S. 507, 94th Cong., 2d Sess., at 88–97 (Transcript).

> CONGRESSMAN SEIBERLING: [T]his means, even where you had something that was statutorily made part of the study, or had previously been withdrawn and was covered by the 15-year review period, that some special interests could get the Secretary to knock it out and the period of review would terminate.
>
> So, here again we have an effort to whittle this thing down. . . .
>
> CONGRESSMAN MELCHER: What the gentleman from Ohio is proposing is we delete what words?
>
> CONGRESSMAN SEIBERLING: [D]elete paragraph (d) on page 109.

Transcript at 88–89.

After a vigorous but inconclusive debate on § 603(c), Rep. Seiberling intervened.

> CONGRESSMAN SEIBERLING: Mr. Chairman, we are getting hopelessly bogged down in this. My suggestion is the House Conferees propose we leave Section (c) as it is in the draft bill before us. I will withdraw my objections to it provided we take out (d) which is the bold-face type on page 109 which, in my view, would deprive Congress which would give the Secretary the ability to deprive Congress of the ability to finally decide what to do at the end of the study period.[13]

---

[12] This Memorandum does not address the constitutionality of such a one-House veto

[13] As discussed *infra* in more detail, we attach no particular significance to the somewhat garbled structure of this sentence. We believe the context clearly indicates that the Congressman was expressing concern that subsection (d) would give the Executive Branch power to deprive the Congress of the authority to finally decide whether a particular area was to be designated wilderness or not. The Interior Department Memorandum, through the use of an ellipsis, gives this statement the same effect.

> He could completely by-pass the study period by simply rec-
> ommending a certain area be taken out of the study program and
> that would be the end of it unless Congress vetoed it.
>
> CONGRESSMAN MELCHER: Is there any objection to the
> proposal by Mr. Seiberling on the House side?
>
> CONGRESSMAN YOUNG: Do I understand the gentleman cor-
> rectly? All we are doing is deleting (d)?
>
> CONGRESSMAN MELCHER: Deleting (d), leaving the rest of
> the language.

Transcript at 93–94. Section (d) was deleted, therefore, *id.* at 97, because of the concern articulated by Rep. Seiberling that it placed too much power in the hands of the Executive by diluting Congress' check on the President's recommendations as to *non-suitable* areas. The concern which was expressed is that an area could be declared unsuitable and taken out of eligibility for wilderness treatment merely as a result of an Executive Branch decision and the absence of affirmative action by Congress. The entire debate proceeded on the assumption that the President had the duty to make recommendations as to non-suitable areas under § 603(b) prior to the deletion of subsection (d)—and afterwards. The only difference after the deletion of (d) is that those recommendations cannot become law without affirmative congressional action. They remain recommendations.

The same analysis of the statute's requirement seems to have been made by at least one court. *Utah* v. *Andrus,* 486 F. Supp. 995 (D. Utah 1979), involved a charge that BLM's regulation of federal land that had been identified as having wilderness characteristics was injuring a piece of state property that it completely surrounded. In setting out the facts underlying the government's interest, the court described the wilderness study procedure in an explanatory footnote.

> The BLM procedure for carrying out the wilderness review
> portions of FLPMA is as follows: First, the agency identifies
> roadless areas of 5000 acres or more which have wilderness
> characteristics. These areas are then designated Wilderness Study
> Areas (WSAs), and BLM studies each area to determine the
> suitability of the area for inclusion in the Wilderness System. At
> this point in its planning, BLM looks at all the potential uses of an
> area, including the potential for mineral development. After
> completion of this phase BLM reports to the President its recom-
> mendation as to each area's suitability (*or lack thereof*) for inclu-
> sion in the Wilderness System. *The President then makes his
> recommendations to Congress, which makes the final
> determination.*

486 F. Supp. at 1001 n.9 (emphasis added) (dictum).

69

## IV. The Associate Solicitor's Memorandum

The Memorandum relies on the statutory language of 43 U.S.C. § 1782 and congressional intent to support its position. We are not convinced by its arguments.

1. The Memorandum points out that whereas the Secretary makes recommendations to the President "as to the suitability or nonsuitability of each such area," 43 U.S.C. § 1782(a), the President makes recommendations to Congress only "with respect to designation as wilderness of each such area." *Id.*, § 1782(b). The difference in language between subsections (a) and (b) is read by the Associate Solicitor to mean that Congress did not intend to require the President to submit recommendations as to unsuitable land—otherwise, Congress "surely would have selected language similar to that contained in subsection (a)." Memorandum at 2.

We believe that the language employed by Congress does not support the construction suggested. First, subsection (b) does not require the President to submit only recommendations favoring designation as wilderness, but rather recommendations "*with respect to* designation as wilderness *of each such area.*" 43 U.S.C. § 1782(b) (emphasis added). Requiring the President to make a recommendation "with respect to" "each such area" seems fully as broad as requiring the Secretary to make a recommendation for each such area as to its suitability or non-suitability. While the language in subsections (a) and (b) is not identical, the words in subsection (b) are certainly broad enough to embrace the process referred to in subsection (a), do not expressly connote a more limited intent, and the terms of (a) are identical to those used in 16 U.S.C. § 1132 which has not been construed in the manner suggested by the Associate Solicitor. In short, we can see no basis for the interpretation reached by the Associate Solicitor.

Second, we do not believe, as Interior does, that "each such area" is ambiguous. Memorandum at 4. We believe that every use of "each such area" in § 1782 has the same meaning. Although the Memorandum argues that " 'of each such area' can just as easily" be construed as referring only to the areas the President recommends as "suitable for wilderness," *id.*, we disagree. First, this would require assuming that Congress meant the same phrase to have two different meanings within the space of a few sentences, a most unlikely event. Second, it would require reading "of each *such* area" as referring back to some prior point in the section where "such" areas are identified—but there is no prior reference that would give a narrow meaning to the word "such." The only possible "areas" to which "such" can refer are in § 1782(a) which, the Associate Solicitor concedes, includes all areas being studied.[14]

2. Interior believes that § 1782(c) is also ambiguous. Again, it is unlikely that Congress would intend "such areas" and "such lands," both phrases found in

---

[14] We would reach this conclusion even if we did not have the example of other statutes which combine both these sentences in the same paragraph. *See supra*, notes 5 & 6

§ 1782(c), to differ so radically in meaning from such subsection to subsection. Interior argues, however, that "the 'such lands' provision more appropriately refers to those lands that have been recommended to Congress for wilderness under section 603(b) . . . [They are lands] which have been determined by the President to be suitable for wilderness purposes." Memorandum at 4, 5. We cannot agree that this interpretation comports with the "broad scheme" of § 1782. *Id.* at 4. If the lands can be returned to multiple use management as soon as the President decides they are unsuitable, it is certainly possible that such use would irreparably impair the suitability of such areas for preservation as wilderness. By the time Congress had learned of the decision and acted to override it, the characteristics sought to be preserved might no longer exist.[15] The interim management provision would be frustrated by irreversible disturbances of the status quo. *See Parker* v. *United States,* 448 F. 2d 793, 797 (10th Cir. 1971), *cert. denied,* 405 U.S. 989 (1972).

3. Section 1782(b) concludes with the sentence, "A recommendation of the President for designation as wilderness shall become effective only if so provided by an Act of Congress." The Memorandum takes the position that this demonstrates that Congress retained control only of areas which are to be designated as wilderness, not of unsuitable areas. "The logical conclusion is that no provision [for unsuitable areas] was necessary since reports on such nonsuitable areas would not be required to be sent to Congress for decision." Memorandum at 3.

The negative inference of this sentence provides, we believe, the strongest support for the interpretation urged by Interior. However, we believe that the Interior interpretation misapprehends Congress' concern. One of the express congressional purposes for the FLPMA was to reassert Congress' control over federal lands, specifically, to insure that

> the Congress exercise its constitutional authority to withdraw or otherwise designate or dedicate Federal lands for specified purposes and that Congress delineate the extent to which the Executive may withdraw lands without legislative action.

43 U.S.C. § 1701(a)(4).[16] The FLPMA repealed the President's implied authority to make withdrawals, FLPMA, § 704(a) Pub. L. No. 94-579, 90 Stat. 2792 (1976), and carefully limited the Executive's express authority to make withdrawals. *See* 43 U.S.C. § 1714. Even § 603 contains a limit on the Secretary's withdrawal authority. 43 U.S.C. § 1782(c) (mining lands). Section 1782(b) is an expression of Congress' concern that the President not make any effort to protect wilderness lands by unilateral action. It is very weak support for the argument that Congress left in the President's hands the even broader authority to determine the status of areas by failing to make a recommendation.

---

[15] The rationale for preserving the character of the land is theoretically stronger, from Congress' standpoint, for areas which the President does *not* believe to be *suitable* He would not be likely to need any congressional admonition to avoid impairing the wilderness characteristics for lands which he believed suitable for wilderness designation

[16] Withdrawals, 43 U S.C § 1702(j). are the withholding of Federal land from settlement in order to limit activities and thereby maintain some particular public value, such as wilderness characteristics.

71

This sentence of subsection (b), on which this argument is predicated, is also found in the Wilderness Act, 16 U.S.C. § 1132, which, as noted earlier, was administered by three Presidents to require reports and recommendations to Congress on suitable and non-suitable areas. This construction, the plain reading of the statute as a whole, the other inferences to be drawn from the language of the statute and the legislative history, considerably outweigh the argument made by Interior. In short, we do not believe that this sentence can be construed in the manner suggested.

4. Interior also finds support for its position in the fact that the Secretary is required to conduct mineral surveys only for areas he considers suitable for inclusion in the wilderness system, 43 U.S.C. § 1782(a). It argues that this indicates that Congress only wanted such information on suitable areas because it would not be involved in decisions about unsuitable areas. A short answer to this is that any inference about the mineral surveys must apply equally to the President. Since it is the Secretary who conducts the surveys based on *his* assessment of what areas are suitable, Interior's logic would compel the conclusion that the President also would only be involved in decisions regarding suitable areas because those areas are the only ones for which the President would receive surveys. Obviously, the statute does not permit such a conclusion. It seems more likely that, in the interests of administrative economy, Congress directed mineral surveys of the areas that will probably end up being designated as wilderness but did not intend this to be a limit on the areas as to which the Secretary or the President should make recommendations.

5. The next rationale offered by Interior is that requiring the President to make recommendations on all areas will place the land into an administrative quasi-permanent limbo that will frustrate FLPMA's purpose. Memorandum at 5–6. This purpose, it is said, is the "expeditious" return of land to management based on multiple use. Memorandum at 6. First, this ignores the categorical directive in § 1782(c) that the land be managed to protect its wilderness characteristics "until Congress has determined otherwise." Second, it assumes that this interim management scheme requires the Secretary to act so narrowly that the land will be of no use for the long period of time that Congress has the area's future under advisement. This ignores both the provisos in § 1782(c) that provide for certain continuing uses of the land and the court interpretations that have upheld various activities in the areas. *See Rocky Mountain Oil & Gas Ass'n v. Andrus,* 500 F. Supp. 1338 (D. Wyo. 1980) (mining), *appeal docketed,* No. 81-1040 (10th Cir. Jan. 5, 1981)\*; *Utah v. Andrus,* 486 F. Supp. 995 (D. Utah 1979) (access roads for timber harvesting). Further, the status of an area recommended for non-inclusion will stay in the status dictated by subsection (c) only as long as Congress wishes. It is difficult to conclude that this somehow is contrary to congressional intent.

---

\*NOTE. In response to the Secretary's appeal in this case, the court of appeals narrowed the district court's construction of the statutory exemption for existing uses of designated lands, holding that "Congress intended to limit existing mining and grazing activities to the level of physical activity being undertaken    so as to prevent impairment of wilderness characteristics " 696 F.2d 734, 749 (10th Cir 1982) citing *Utah v. Andrus,* 486 F. Supp 995 (D Utah 1979). Ed

6. Interior argues that the conference committee transcript indicates that Rep. Seiberling was confused and thought that proposed § 603(d) gave the *Secretary*, rather than the President, the power to release unsuitable areas. Memorandum at 9. *See supra*, n. 13. We doubt whether Rep. Seiberling was confused, not only because of his long involvement with FLPMA, *see supra*, n. 5, culminating in his being chosen as a member of the House delegation to the conference, but also because of his arguments, *see* Transcript, *supra*, at 88–97, detailing his objections to proposed § 603(d). The use of the word "Secretary" is not material to the central issue under debate and we simply cannot attach any significance to it. Nor can we agree with Interior's argument that Rep. Seiberling supported the deletion of § 603(d) "even after recognizing that by such deletion the executive branch could release the land without Congressional approval." Memorandum at 9. The Transcript seems to us to mean just the opposite—that Rep. Seiberling supported the deletion of § 603(d) because he did not want the Executive Branch to be able to bypass congressional action on this subject. Transcript, *supra*, at 94. The quoted language simply does not support the significance attached to it by the Associate Solicitor.

Finally, Interior argues that since § 603(b) already gave the President the power to release unsuitable land, the purpose of § 603(d) was to give Congress the authority to override that release. Deletion of § 603(d), therefore, is construed to mean that Congress did not want to exercise this review authority and left release to the President's unfettered discretion. We disagree. Interior's entire argument is based on the premise with which we are unable to agree, that § 603(b) gives the President release authority. For the reasons stated above, we cannot agree with Interior's reasoning.

We conclude that § 603 calls upon the Secretary to conduct a study of certain areas, to make recommendations to the President with respect thereto, and for the President to make recommendations concerning those areas to the Congress. We are unable to find any credible support for the argument that the President need not make recommendations to Congress as to some areas, but may in fact remove the land from further consideration without any congressional submission. The statute's language, its legislative history, administrative practice regarding previous legislation which is virtually identical, and judicial interpretation all lead to the conclusion that there is no implicit authority in the President to unilaterally release lands from further study merely because he believes them to be unsuitable. The President must make recommendations as to all areas studied by the Secretary and he must await Congress' decision as to their ultimate fate.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*