**ROCKY MOUNTAIN OIL AND GAS ASSOCIATION, Plaintiff-Appellee,**

v.

**James G. WATT, Secretary of the Interior, et al., Defendants-Appellants,**

and

**Sierra Club, Natural Resources Defense Council, National Wildlife Federation, and Wilderness Society, Intervenors-Appellants.**

**Nos. 81–1040, 81–1041.**

United States Court of Appeals, Tenth Circuit.

Nov. 30, 1982.

Rehearing Denied Jan. 25, 1983.

Thomas H. Pacheco, Atty., Dept. of Justice, Washington, D.C. (Carol E. Dinkins, Asst. Atty. Gen., Washington, D.C., Richard A. Stacy, U.S. Atty., Cheyenne, Wyo., Carolyn P. Osolinik and Robert L. Klarquist, Attys., Dept. of Justice, Washington, D.C., with him on the brief), for defendants-appellants.

Laurens H. Silver of Sierra Club Legal Defense Fund, Inc., San Francisco, Cal. (John Wiener, Laramie, Wyo., with him on the brief), for intervenors-appellants.

Pamela A. Ray, Denver, Colo. (Craig R. Carver, Denver, Colo., with her on the brief), of Head, Moye, Carver & Ray, Denver, Colo., for plaintiff-appellee.

Mary Jane C. Due, Washington, D.C., filed an amicus curiae brief for American Mining Congress.

Before DOYLE, McKAY and SEYMOUR, Circuit Judges.

SEYMOUR, Circuit Judge.

In this case, plaintiff Rocky Mountain Oil and Gas Association (RMOGA) challenged the Department of the Interior's interpretation of section 603(c) of the Federal Land Policy and Management Act of 1976, 43 U.S.C. § 1782(c) (1976) (FLPMA or Act), as it relates to oil and gas activity on public lands under federal lease. RMOGA sought declaratory and injunctive relief barring Interior's application of a "nonimpairment" standard of protection for wilderness values when it considers lessees' applications to conduct exploration and development activities in Bureau of Land Management Wilderness Study Areas. Several environmental groups sought and were granted permission to intervene as party defendants. The district court granted RMOGA's motion for summary judgment, concluding that Interior's interpretation of section 603 was erroneous as a matter of law, and vacating Interior's programs promulgated under that section. On appeal, we hold that the trial court erred in its interpretation of section 603. Accordingly, we reverse.

## I.

## BACKGROUND

### A. The Federal Land Policy and Management Act

The Bureau of Land Management (BLM), located within the Department of the Interior, administers roughly one-fifth of our Nation's land mass, approximately 450 million acres of federal lands. H.Rep. No. 1163, 94th Cong., 2d Sess. 2, reprinted in 1976 U.S.Code Cong. & Ad.News 6175; S.Rep. No. 583, 94th Cong., 1st Sess. 24 (1975), reprinted in Comm. on Energy & Natural Resources, Legislative History of the Federal Land Policy and Management Act of 1976, at 89 (1978). The beauty of some of these lands rivals that of our most spectacular national parks and forests. Nevertheless, until recently Congress had not established a comprehensive statutory base for the management of these lands, as it had for the smaller national park, forest, and wildlife refuge systems. Instead, the BLM was charged with administering the lands and their resources under a myriad of public land laws serving a variety of competing and often conflicting interests. 121 Cong.Rec. 1846 (1975). Recognizing the need to provide guidance and a comprehensive statement of congressional policies concerning the management of the public lands,[1] Congress enacted the Federal Land

---

1. As used in the FLPMA and this opinion, the term "public lands" means lands owned by the United States and administered by the BLM, excepting Outer Continental Shelf and native

Policy and Management Act of 1976, 43 U.S.C. §§ 1701–1782 (1976 & Supp. III 1979).

The FLPMA is a complex statute, containing many interdependent sections in order to provide the BLM with a versatile framework for its management efforts. Consequently, individual provisions must be examined in the overall context of the Act. Section 603, at issue in this case, lies at the heart of the Act's land inventory and management processes. Therefore, we undertake a short examination of the FLPMA's purposes and inventory procedures before construing section 603.

The national policy declared in the FLPMA stands in marked contrast to the many older public land statutes that provided for the wholesale disposition of the public lands.[2] The FLPMA requires the retention of public lands in public ownership unless, through the Act's extensive land use planning procedures, disposition of a parcel of land is found to be in the national interest, FLPMA § 102(a)(1), 43 U.S.C. § 1701(a)(1). The public lands are to be managed in a manner

> "that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat

for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use."

*Id.* § 102(a)(8), 43 U.S.C. § 1701(a)(8). At the same time, the public lands are to be managed in recognition of "the Nation's need for domestic sources of minerals, food, timber, and fiber from the public lands." *Id.* § 102(a)(12), 43 U.S.C. § 1701(a)(12).

The FLPMA requires Interior to recognize competing values. To accomplish this legislative directive within a finite land base, it is necessary to realize that the Act provides a comprehensive statement of congressional policies. It represents an attempt by Congress to balance the use of the public lands by interests as diverse as the lands themselves. Accordingly, Congress provided that the BLM should manage the public lands by using the Act's procedures in a dynamic, evolving manner to accommodate these competing demands.[3] Congress directed the BLM to manage the public lands on a "multiple use" basis, *id.* §§ 102(a)(7), 302(a), 43 U.S.C. §§ 1701(a)(7), 1732(a), "making the most judicious use of the land *for some or all* of [the public land] resources" and using "some land for *less than all* of the resources," where appropriate, *id.* § 103(c), 43 U.S.C. § 1702(c). Thus, under sections 102(a)(7)–(8), (12), and 302(a), the BLM need not permit all resource uses on a given parcel of land.[4]

---

trust lands. FLPMA § 103(e), 43 U.S.C. § 1702(e) (1976).

**2.** Prior to the FLPMA, the BLM and its predecessor agencies managed the public lands under some 3,000 public land laws, *e.g.*, the General Mining Law of 1872, Act of May 10, 1872, ch. 152, 17 Stat. 91 (codified as amended in scattered sections of 30 U.S.C.), and the various homestead laws. Sections 702–706 of the FLPMA explicitly repealed or amended many of those older laws, *see* Pub.L. No. 94–579, §§ 702–706, 90 Stat. 2743, 2787–94 (1976) (list of laws repealed and amended). Other sections establish management directives that supersede Interior's prior management responsibilities. *See, e.g.,* FLPMA § 302(b), 43 U.S.C. § 1732(b) (manage generally to prevent unnecessary or undue degradation; General Mining Law amended); *id.* § 314, 43 U.S.C. § 1744 (failure to file unpatented mining claims consti-

tutes abandonment); *id.* § 601(f), 43 U.S.C. § 1781(f) (management of mining claims within California Desert Conservation Area); *id.* § 603(c), 43 U.S.C. § 1782 (management of areas under wilderness review). *See also* H.Rep. No. 1163, 94th Cong., 2d Sess. 2, *reprinted in* 1976 U.S.Code Cong. & Ad.News 6175.

**3.** *See, e.g.,* FLPMA § 103(c), 43 U.S.C. § 1702(c) (management to allow periodic adjustments in use to meet changing needs and conditions); *id.* § 201(a), 43 U.S.C. § 1711(a) (Secretary to maintain a continuing inventory of all public lands and resources and to update it to reflect changes and new values).

**4.** "If all the competing demands reflected in FLPMA were focused on one particular piece of public land, in many instances only one set of demands could be satisfied. A parcel of land cannot both be preserved in its natural

The FLPMA contains comprehensive inventorying and land use planning provisions to ensure that the "proper multiple use mix of retained public lands" be achieved. H.Rep. No. 1163, *supra,* at 2, U.S.Code Cong. & Admin.News 1976, 6176. Section 201(a) directs the Secretary to prepare and maintain an inventory of all public lands and their values. 43 U.S.C. § 1711(a). The Secretary also is required to review those roadless areas in excess of 5,000 acres identified in the inventory process as having "wilderness characteristics described in the Wilderness Act," and to recommend such areas as suitable or unsuitable for preservation as wilderness. FLPMA § 603(a), 43 U.S.C. § 1782(a).

Several sections of the Act prescribe management standards for the BLM. In general, the BLM is to prevent unnecessary or undue degradation of the public lands. *Id.* § 302(b), 43 U.S.C. § 1732(b). Section 505 provides additional directives for the administration of rights-of-way. 43 U.S.C. § 1765. Section 603(c) establishes the standards for lands under wilderness review. During the review period, and until Congress determines otherwise, Interior is required to manage the lands under review "in a manner so as not to impair the suitability of such areas for preservation as wilderness, subject, however, to the continuation of existing mining and grazing uses and mineral leasing in the manner and degree in which the same was being conducted on October 21, 1976: *Provided,* That, in managing the public lands the Secretary shall by regulation or otherwise take any action required to prevent unnecessary or undue degrada-

tion of the lands and their resources or to afford environmental protection."
43 U.S.C. § 1782(c).

### B. Administrative Interpretation and Policy

Interior interpreted section 603(c) as requiring all activities not protected under the section's "grandfather" clause to be regulated so as not to impair a Wilderness Study Area's (WSA's) suitability as wilderness. BLM Wilderness Review—Section 603, Federal Land Policy and Management Act, 86 Interior Dec. 91, 99, 101–02, 109–11 (1978) (hereinafter cited as Solicitor's Opinion).[5] The Solicitor interpreted the grandfather clause as exempting from the nonimpairment standard the actual uses of an area as they existed on the date of the Act's passage. Thus, mining and grazing activities, and activities on mineral leases, are considered permissible within a WSA to the extent that such operations were actually occurring on October 21, 1976. *Id.* at 111–12, 114–15. Under the Solicitor's interpretation, grandfathered uses are themselves subject to regulation to prevent unnecessary or undue degradation of the WSA and its resources, and to protect the environment. *Id.* at 118–19.

Pursuant to the Solicitor's Opinion, the BLM developed the Wilderness Inventory Handbook and the Interim Management Policy and Guidelines for Lands Under Wilderness Review (IMP).[6] These documents set out Interior's management policies concerning section 603's wilderness review, and detail Interior's interpretation of the nonimpairment standard.[7]

---

character and mined. Thus, it would be impossible for BLM to carry out the purposes of the Act if each particular management decision were evaluated separately. It is only by looking at the overall use of the public lands that one can accurately assess whether or not BLM is carrying out the broad purposes of the statute."
*Utah v. Andrus,* 486 F.Supp. 995, 1003 (D.Utah 1979).

**5.** Subsequent to the district court's decision, the Solicitor of the Interior issued a second

opinion addressing the development rights of pre-FLPMA leases. *See infra* note 17.

**6.** Both the Wilderness Inventory Handbook and the IMP were promulgated using notice and comment procedures. Interior sought and received considerable public testimony before adopting the Handbook and IMP in final form. *See, e.g.,* Rec., vol. II, Sopher aff. at 430–32.

**7.** Interior set forth its interpretation of the nonimpairment standard in detail in the IMP, following the guidelines of the Solicitor's Opinion. Activities that protect or enhance the land's

In 1978, Interior initiated its wilderness review program. Initially, a "wilderness inventory" process is used to identify those roadless areas of 5,000 acres or more and those roadless islands that may have wilderness characteristics. An "intensive inventory" is then performed on those areas. Areas identified at this stage as meeting section 603's requirements are designated "Wilderness Study Areas." WSAs are then studied to determine whether they will be recommended as suitable or unsuitable for wilderness designation. *See* 45 Fed.Reg. 75,574–75 (1978); Bureau of Land Management, U.S. Dep't of the Interior, Wilderness Inventory Handbook 8–15 (1978). From the initial "inventory" of all public lands to the final formal recommendation stage, all lands still being considered in the process are managed under the nonimpairment standard. Bureau of Land Management, U.S. Dep't of the Interior, Interim Management Policy and Guidelines for Lands Under Wilderness Review 5–7 (1979).

### C. The Trial Court's Decision

The trial court found the Solicitor's Opinion to be contrary to section 603 of the FLPMA. *Rocky Mountain Oil & Gas Association v. Andrus,* 500 F.Supp. 1338, 1344 (D.Wyo.1980). Stating that section 603 was clear and unequivocal on its face, the court apparently construed the language of the grandfather clause to mean that all mineral leasing activity, including activity on leases granted before and after the FLPMA was enacted, was insulated from the nonimpairment standard. *See id.* at 1344–46. The

court held that although the FLPMA embodied congressional concern for several policies and interests, the Solicitor's interpretation completely sacrificed mineral development for environmental concerns and thus was "statutorily erroneous." *Id.* at 1344.

The trial court also examined Interior's policy of including Wilderness Protection Stipulations in leases issued after 1978. These stipulations stated that the area being leased was a WSA to which the nonimpairment standard would apply, putting potential lessees on notice that development of the lease might be precluded. The court found this system of offering leases on which development might be prohibited to be "clearly an unconstitutional taking, and . . . blatantly unfair to lessees." *Id.*

Finally, the court found Interior's position to be "counterproductive to public interest." *Id.* at 1346. The court ordered the Solicitor's Opinion, the Wilderness Inventory Handbook, and the Interim Management Policy and Guidelines for Lands Under Wilderness Review vacated and set aside.

### II.

### PRELIMINARY MATTERS

Before we reach the merits of petitioners' claim, we must resolve questions of ripeness and exhaustion of administrative remedies.

### A. Ripeness

The classic statement of the rationale of the ripeness doctrine is found in *Abbott*

---

wilderness values, or that provide the minimum necessary public facilities for enjoyment of wilderness values, are considered nonimpairing. Bureau of Land Management, U.S. Dep't of the Interior, Interim Management Policy and Guidelines for Lands Under Wilderness Review 10 (1979). Interior considers any other activity nonimpairing if:

"a. It is temporary [as defined in the IMP].

"b. Any temporary impacts caused by the activity [are] capable of being reclaimed to a condition of being substantially unnoticeable in the wilderness study area . . . as a whole by the time the Secretary is scheduled to send his recommendations on that area to the President. . . . [I]n areas not yet scheduled

for wilderness study, [the area must be reclaimable within four years of] approval of the activity. . . .

" . . .

"c. When the activity is terminated, and after any needed reclamation is complete, the area's wilderness values [will] not have been degraded so far, compared with the area's [other] values . . ., as to significantly constrain the Secretary's recommendation with respect to the area's suitability or nonsuitability for preservation as wilderness."

*Id.* at 10–11. The draft IMP stated that an activity was "temporary" if the land was capable of being rehabilitated within five years. *See, e.g.,* Rec., vol. XX, D. Andrus dep. at 48.

*Laboratories v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967): to prevent judicial entanglement in abstract questions of administrative policy, and to protect agencies from judicial interference until agency decisions are formalized and affect a challenger in a concrete manner. The Court enunciated a two-part test for determining ripeness: first, whether the issues are fit for judicial decision, and second, whether the parties will suffer hardship if the court withholds its consideration. *Id.* at 149, 87 S.Ct. at 1515; *see United States v. Gotcher (In re Grand Jury, April 1979),* 604 F.2d 69, 72 (10th Cir.1979).

The case before us easily satisfies the first part of the *Abbott* inquiry. Interior's adoption of the Solicitor's interpretation of section 603, and its reliance on that interpretation in promulgating the Wilderness Handbook and the Interim Management Policy and Guidelines, constitute final agency action for the purposes of this appeal, as indeed the government concedes. *See* Brief for Federal Appellants at 15.[8] The "wilderness inventory" and "intensive inventory" processes, which were essentially completed at the time of trial, were performed in accordance with the Wilderness Handbook. The IMP, in both draft and final form, has been used in processing Applications for Permits to Drill (APDs) in Wilderness Study Areas since 1978. APDs within WSAs have been denied based upon the agency's interpretation of the nonimpairment standard. Interior's implementation of this policy amply demonstrates that it has taken a definitive position; its administration of the policy is "anything but 'a matter of speculation,'" *Environmental Protection Agency v. National Crushed*

*Stone Association,* 449 U.S. 64, 72 n.12, 101 S.Ct. 295, 301 n. 12, 66 L.Ed.2d 268 (1980). No "abstract questions of administrative policy" are presented; rather, the issue is purely one of statutory interpretation, and thus is eminently fit for judicial consideration.[9]

The second part of the *Abbott* test, hardship to the parties, presents a more difficult question. To be ripe, the challenged action must have a direct and immediate impact on the challenging party. *Abbott Laboratories,* 387 U.S. at 152–53, 87 S.Ct. at 1517; *see Norvell v. Sangre de Cristo Development Co.,* 519 F.2d 370, 376 (10th Cir.1975); *see also Utah v. Andrus,* 636 F.2d 276, 278 (10th Cir.1980) (harm alleged cannot be purely speculative and based upon occurrence of remote contingencies).

Interior and Intervenors (hereinafter collectively referred to as "Appellants") urge that this case does not satisfy the "harm" element of *Abbott,* arguing that the required aggregate of harm will not accrue until the denial of an APD is appealed through the administrative review process. This argument misses the mark in that it does not consider the nature of the harm suffered by RMOGA's members. That harm is best understood after a brief examination of oil and gas exploration and development economics. *See generally* Joint Appendix, 62–66, 71–106.

Many hundreds of thousands of dollars in exploration costs may be spent prior to a company's decision to drill an exploratory well. If the decision is made to drill, then a permit to drill must be sought. If an APD is granted, the well can then be drilled, at a cost ranging from $3,000,000 to $4,000,000

---

8. The Supreme Court has counseled courts to be pragmatic in determining finality for purposes of review. *Abbott Laboratories,* 387 U.S. at 149–50, 87 S.Ct. at 1515–16. Under the Administrative Procedures Act, reviewable "final agency action," 5 U.S.C. § 704 (1976), includes a "rule," *id.* § 551(13). A "rule" is "an agency statement of general ... applicability and future effect designed to implement, interpret, or proscribe law or policy." *Id.* § 551(4). The agency's interpretation of its enabling statute is within this definition, and is reviewable.

*See National Automatic Laundry & Cleaning Council v. Shultz,* 443 F.2d 689, 698 (D.C.Cir. 1971).

9. This case is not one in which additional agency fact findings would aid or affect judicial resolution of the problem of construction. *See* our discussion of the exhaustion issue in Part II. B. *infra; see, e.g., Gardner v. Toilet Goods Ass'n,* 387 U.S. 167, 171, 87 S.Ct. 1526, 1528, 18 L.Ed.2d 704 (1967).

for a wildcat well in the Rocky Mountain area. If the well is successful, still more permits to drill must be obtained in order to develop a working field. Full-field development generally entails drilling additional wells and conducting considerable surface activities, including construction of roads and facilities for the transportation of the oil and gas discovered.

In the Rocky Mountain area, the average ratio of exploratory wells drilled to viable discoveries is 50 to 1. In order to pursue such a high-risk activity, a developer must be able to count on developing those wells reaching commercial finds. In the absence of such assurance, a developer must look long and hard at the situation before deciding to initiate exploration. RMOGA has introduced evidence demonstrating that its members are retreating from further activities in Wilderness Study Areas because of the added economic uncertainty generated by Interior's policy, to the extent of abandoning good prospects and writing off monies already expended in their exploration. RMOGA has also introduced evidence showing that although APDs may be granted for exploratory wells, they will not be granted for full-field development.[10]

■ Thus, evidence throughout the record demonstrates harm sustained by RMOGA's members as a result of investment decisions forced upon them by Interior's policy, and by Interior's actual and constructive rejection of APDs. Indeed, the district court found that RMOGA's members have suffered "[i]rreparable financial harm ... through the implementation of the Solicitor's opinion and ensuing regulations because of the loss of monies previously invested and the halting of oil and gas exploration and development." 500 F.Supp. at 1343. This clearly amounts to a factual finding of financial harm suffered by RMO-

GA's members. As such, we may not overturn the district court's conclusion unless we find it clearly erroneous. Fed.R.Civ.P. 52(a). For the reasons outlined above, we do not so find.

■ Appellants also argue that this sort of business-related economic harm does not suffice to meet the *Abbott* standard. We do not agree. In *Environmental Protection Agency v. National Crushed Stone Association,* 449 U.S. 64, 101 S.Ct. 295, 66 L.Ed.2d 268 (1980), the Supreme Court examined EPA regulations establishing pollution discharge standard variance provisions. The regulations stated that applicants' economic inability to meet the costs of implementing the standards would not be considered as a basis for granting a variance. In that case, as in the case at bar, the regulations had not been tested in administrative proceedings. The Court found that the pre-enforcement review of the regulations was not premature. The regulations affected thousands of emitters, and resolution would determine the continued existence of some, as well as the level of funding that must be budgeted for pollution control by others. *Id.* at 72 n. 12, 101 S.Ct. at 301 n. 12. The industry members' business-related economic uncertainty was sufficient to establish ripeness. *See id.*

In another case involving business-related economic harm, the Supreme Court expressly recognized that a claim is ripe where administrative action directly produces a harmful change in a party's business conduct. *Frozen Food Express v. United States,* 351 U.S. 40, 76 S.Ct. 569, 100 L.Ed. 910 (1956). There, the Court reviewed an Interstate Commerce Commission order before it had been enforced against the challengers. The order declared that carriers of certain commodities were not entitled to an "agricultural" exemption from a general

---

**10.** The amount of surface development and disruption increases greatly between the exploration and development stages. A single exploratory well can be drilled on a one to four acre site, and is serviceable via temporary roads or by other means. If the well does not warrant further development, the area can be quickly reclaimed. Full-field development, however, is quite another story. Apart from the obvious difference in life expectancy, measured in years rather than months, the amount of surface disruption is much greater. *See, e.g.,* Rec., vol. XX, D. Andrus dep. at 40–41; vol. XX, Belisle dep. at 39–41, 81–82; vol. XXI, Sopher dep. at 36–37, 39; vol. XXII, Wolfe dep. at 21, 37–39; Joint Appendix at 76–78, 83–88.

permit or certificate requirement. The Court found that "[t]he 'order' of the Commission [was] in substance a 'declaratory' one ... which touches vital interests of carriers and shippers alike and sets the standard for shaping the manner in which an important segment of the trucking business will be done." *Id.* at 44, 76 S.Ct. at 571; *see, e.g., Abbott Laboratories,* 387 U.S. at 152, 87 S.Ct. at 1517; *Columbia Broadcasting System v. United States,* 316 U.S. 407, 417–19, 62 S.Ct. 1194, 1200–01, 86 L.Ed. 1563 (1942).

In the present case, Interior's policy has directly affected the investment decisions of many oil and gas developers, causing them substantial financial losses. Just as in *Frozen Food Express,* the agency's policy touches the "vital interests" of oil and gas developers, shaping the business conduct of this important segment of the oil and gas industry. Withholding review would cause even more harm.[11] Appellants do not allege any hardship resulting from our consideration of the issue, and we find none. Under these circumstances, the ripeness requirement is satisfied.

### B. Exhaustion of Administrative Remedies

Generally, a litigant must exhaust available administrative remedies prior to seeking judicial review. *Myers v. Bethlehem Shipbuilding Corp.,* 303 U.S. 41, 50–51, 58 S.Ct. 459, 463, 82 L.Ed. 638 (1938); *Martinez v. Richardson,* 472 F.2d 1121, 1125 (10th Cir.1973).[12] The Supreme Court explained the rationale behind the doctrine in *McKart v. United States,* 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969):

"A primary purpose is, of course, the avoidance of premature interruption of the administrative process. The agency, like a trial court, is created for the purpose of applying a statute in the first instance. Accordingly, it is normally desirable to let the agency develop the necessary factual background upon which decisions should be based. And since agency decisions are frequently of a discretionary nature or frequently require expertise, the agency should be given the first chance to exercise that discretion or to apply that expertise....

"Closely related to the above reasons is a notion peculiar to administrative law. The administrative agency is created as a separate entity and invested with certain powers and duties. The courts ordinarily should not interfere with an agency until it has completed its action, or else has clearly exceeded its jurisdiction. As Professor Jaffe puts it, '[t]he exhaustion doctrine is, therefore, an expression of executive and administrative autonomy.' This reason is particularly pertinent where the function of the agency and the particular decision sought to be reviewed involve exercise of discretionary powers granted the agency by Congress, or require application of special expertise.

"... Particularly, judicial review may be hindered by the failure of the litigant to allow the agency to make a factual record, or to exercise its discretion or apply its expertise."

---

11. As we have noted, withholding judicial intervention until an APD for full field development has been denied would require a developer to risk hundreds of thousands of dollars in nonrecoverable development costs in order to gain judicial review of this purely statutory question.

12. The doctrine is one of discretion rather than jurisdiction. "The extent to which a federal court may rightly relax the rule where the order of the administrative body is assailed in its entirety, rests in the sound discretion which guides exercise of equity jurisdiction." *Natural Gas Pipeline Co. v. Slattery,* 302 U.S. 300, 311, 58 S.Ct. 199, 204, 82 L.Ed. 276 (1937) (citations omitted). *See also McKart v. United States,* 395 U.S. 185, 200–01, 89 S.Ct. 1657, 1666, 23 L.Ed.2d 194 (1969) ("[None] of the ... cases decided by this Court ... stand for the proposition that the exhaustion doctrine must be applied blindly in every case."); *NLRB v. Industrial Union of Marine & Shipbuilding Workers,* 391 U.S. 418, 426 n. 8, 88 S.Ct. 1717, 1723 n. 8, 20 L.Ed.2d 706 (1968) ("requirement of exhaustion is a matter within the sound discretion of the courts"). *But see Tunstall v. Brotherhood of Locomotive Firemen & Enginemen,* 323 U.S. 210, 213–14, 65 S.Ct. 235, 237, 89 L.Ed. 187 (1944).

*Id.* at 193–94, 89 S.Ct. at 1662 (footnote omitted).

Appellants urge that RMOGA must contest the denial of an APD through administrative review before its claims may be considered by a court. Appellants suggest that a factual administrative record is essential to this court's determination of the merits of the case. This argument miscasts the central issue before us. The issue is not whether oil and gas drilling could ever be permitted under Interior's nonimpairment standard; rather, we must resolve the purely legal question whether section 603's nonimpairment standard applies to mineral leasing activities at all.[13] Development of a factual record examining the actual application of the nonimpairment standard to oil and gas drilling would be of no assistance to the court. Moreover, the "agency expertise" rationale underlying *McKart's* analysis does not provide a compelling reason to await further administrative action on this question of statutory construction. The agency has had an opportunity to exercise its expertise and has done so, resulting in the interpretation that is before us now.

In *Frontier Airlines v. Civil Aeronautics Board,* 621 F.2d 369 (10th Cir.1980), we reviewed agency orders purportedly authorized by the Airline Deregulation Act of 1978, 49 U.S.C. § 1389(a)(6) (Supp. III 1979). In response to the appellant's argument that

the regulations exceeded the Board's authority, the Board asserted that the issue had not been raised before the Board. We said there that because the Board was "adamant in its belief that it [did] have authority to issue such an order ... it is very doubtful that the Board would have vacated its ... orders had a motion for reconsideration been filed." *Id.* at 370–71. In refusing to dismiss the petition for failure to exhaust administrative remedies, we noted that "the question presented ... is one of pure statutory construction. The general rule requiring exhaustion ... is subject to an exception where the question is solely one of statutory interpretation." *Id.* at 371 (citing *McKart,* 395 U.S. at 197–98, 89 S.Ct. at 1665).

In the case before us, Interior is equally adamant in support of its interpretation of section 603(c). We similarly decline to dismiss on exhaustion grounds. Even if an administrative appeal of the *application* of the IMP were to reach the underlying issue of the nonimpairment standard, at most this would represent an additional administrative decision on this question of law, based on the information that was before the Solicitor and that is before us now. Our review of this question would not be significantly aided by this proliferation of paperwork.[14] *See McKart,* 395 U.S. at 199, 89 S.Ct. at 1665.

13. We emphasize that we are not now examining Interior's interpretation of the nonimpairment standard, *see supra* note 7. A challenge of the reasonableness of Interior's interpretation might well create a situation where it is "desirable to let the agency develop the necessary factual background upon which [the decision] should be based." *McKart,* 395 U.S. at 194, 89 S.Ct. at 1662. We decide only that the nonimpairment standard does apply.

14. Interior also argues that the district court should have deferred to agency expertise under the doctrine of primary jurisdiction. That doctrine was described in *International Bhd. of Boilermakers v. Hardeman,* 401 U.S. 233, 91 S.Ct. 609, 28 L.Ed.2d 609 (1971), as follows:
 " 'The doctrine of primary jurisdiction ... applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special

competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.' *United States v. Western Pac. R. Co.* 352 U.S. 59, 63–64 [77 S.Ct. 161, 164–65, 1 L.Ed.2d 126]. *The doctrine is based on the principle 'that in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over,'* Far East Conference v. United States, 342 U.S. 570, 574, [72 S.Ct. 492, 494, 96 L.Ed. 576], and 'requires judicial abstention in cases where protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme,' *United States v. Philadelphia Nat. Bank,* 374 U.S. 321, 353 [83 S.Ct. 1715, 1736, 10 L.Ed.2d 915]."
*Id.* at 238, 91 S.Ct. at 613 (citation omitted). This is not an instance where the doctrine of

## III.

## THE NONIMPAIRMENT STANDARD

The FLPMA provides a method and a statutory mandate to examine BLM lands for wilderness characteristics,[15] and, where appropriate, to incorporate the lands into the wilderness system. H.Rep. No. 1163, *supra,* at 3, 17–18; S.Rep. No. 583, *supra,* at 43–45. Section 603(a) of the FLPMA requires the Secretary to review roadless areas of five thousand acres or more and roadless islands, identified during the section 201(a) inventory as having wilderness characteristics, and to recommend them to the President as suitable or nonsuitable for preservation.[16] Section 603(c) dictates the management protocol for such areas during the review period, the nub of the present controversy.

▮▮▮▮ In analyzing section 603(c), we must bear in mind several precepts of statutory construction. First, "the language of the statute itself is controlling when it is sufficiently clear in context." *Blue Cross Association v. Harris,* 664 F.2d 806, 809 (10th Cir.1981) (citing *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 201, 96 S.Ct. 1375, 1384, 47 L.Ed.2d 668 (1976)). Where the statute is ambiguous, we must afford deference to the interpretation given the statute by the agency charged with its administration. *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). The administrative interpretation need only be a reasonable one to be accepted, even though there may be another equally reasonable interpretation. *Id.; Brennan v. Occupational Safety & Health Commission,* 513 F.2d 553, 554 (10th Cir.1975). A statute must be interpreted to effect its evident purpose, *Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 608, 99 S.Ct. 1905, 1911, 60 L.Ed.2d 508 (1979), and to be consistent with "evidenced congressional intent," *Symons v. Chrysler Corp. Loan Guarantee Board,* 670 F.2d 238, 242 (D.C.Cir.1981). Although our analysis "must begin with the language of the statute itself," *Touche Ross & Co. v. Redington,* 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979), congressional purpose and intent are best divined by examining the statute's legislative history and background.

With these concepts in mind, we begin our statutory tour. Section 603(c) states that:

"During the period of review of such areas and until Congress has determined otherwise, *the Secretary shall continue to manage such lands* according to his authority under this Act and other applicable law *in a manner so as not to impair the suitability of such areas for preservation as wilderness, subject,* however, *to the continuation of existing mining and grazing uses and mineral leasing in the manner and degree in which the same*

---

primary jurisdiction should be applied. As we have already pointed out, the issue to be decided here is neither a factual one nor one requiring the exercise of administrative discretion.

15. The Act adopts by reference the definition of "wilderness characteristics" described in the Wilderness Act of September 3, 1964, 16 U.S.C. §§ 1131–1136 (1976). FLPMA § 603(a), 43 U.S.C. § 1782(a).

16. Section 603(a) provides in full that:
 "(a) Within fifteen years after October 21, 1976, the Secretary shall review those roadless areas of five thousand acres or more and roadless islands of the public lands, identified during the inventory required by section 1711(a) of this title as having wilderness characteristics described in the Wilderness Act of September 3, 1964 (78 Stat. 890; 16 U.S.C. 1131 et seq.) and shall from time to time report to the President his recommenda-

tion as to the suitability or nonsuitability of each such area or island for preservation as wilderness: *Provided,* That prior to any recommendations for the designation of an area as wilderness the Secretary shall cause mineral surveys to be conducted by the Geological Survey and the Bureau of Mines to determine the mineral values, if any, that may be present in such areas: *Provided further,* That the Secretary shall report to the President by July 1, 1980, his recommendations on those areas which the Secretary has prior to November 1, 1975, formally identified as natural or primitive areas. The review required by this subsection shall be conducted in accordance with the procedure specified in section 3(d) of the Wilderness Act [16 U.S.C. 1132(d)]."

43 U.S.C. § 1782(a).

*was being conducted on October 21, 1976: Provided,* That, in managing the public lands the Secretary shall by regulation or otherwise take any action required to prevent unnecessary or undue degradation of the lands and their resources or to afford environmental protection."

43 U.S.C. § 1782(c) (emphasis added).

Interior construes section 603(c) as requiring the application of the nonimpairment standard to activities on oil and gas leases. Solicitor's Opinion, *supra,* at 113–15. Under Interior's interpretation, only actual development operations occurring on the ground as of October 21, 1976, are protected by the section's grandfather clause.[17] *Id.* at 115–16. And even that grandfathered activity is subject to regulation "to prevent unnecessary or undue degradation . . . or to afford environmental protection." *Id.* at 118–19.

The district court found that the statutory language was clear and unambiguous on its face, 500 F.Supp. at 1344, 1347, and directly contrary to Interior's interpretation, *id.* at 1344. The court apparently construed the nonimpairment standard as inapplicable to mineral leasing as a whole, distinguishing between the protection afforded to mining and grazing activities, and that afforded to mineral leasing activities.

Under the court's interpretation, although mining and grazing evidently would be subject to the nonimpairment standard, "mineral leasing" would not. *All* mineral leasing activities, both physical on-lease development and the actual letting of leases, would be exempt. *Id.* Mineral leasing apparently should be continued by the Secretary "in the manner and degree in which [the Secretary was conducting it] on October 21, 1976."

We disagree both with the trial court's characterization of section 603(c) as clear and unambiguous, and with its interpretation of the section as it pertains to mineral leasing. The court's opinion fails totally to consider the import of Congress' use of "existing" to modify the three listed exemptions. The opinion also fails to provide a persuasive rationale for making a distinction, based on the statutory language, between the treatment to be given "mining and grazing uses" and "mineral leases."

Initially, we note that the grandfather clause in its entirety reads "subject, however, to the continuation of existing mining and grazing uses and mineral leasing in the manner and degree in which the same was being conducted on October 21, 1976." FLPMA § 603(c). The clause contains no internal punctuation indicating that Con-

---

17. On July 20, 1981, the Solicitor issued an opinion modifying the September 5, 1978 Opinion that we address here. *See* The BLM Wilderness Review and Valid Existing Rights, Op. Solic., Dep't of the Interior (July 20, 1981) (hereinafter cited as 1981 Opinion). In the 1981 Opinion, Interior changed its stance regarding leases issued prior to October 21, 1976 on which no development operations had commenced as of that date. While recognizing the applicability of the § 603(c) nonimpairment standard, the opinion states that the application of that standard to pre-FLPMA leases may be limited in some instances because of § 701(h) of the FLPMA, 43 U.S.C. § 1701 note, which provides that "[a]ll actions by the Secretary concerned under this Act shall be subject to valid existing rights." 1981 Opinion at 4–5. The opinion notes that a review of each lease or approval document will be necessary to determine the scope of any such pre-existing rights held by the lessee. *Id.* The opinion also states that it "formalizes and is consistent with" Interior's position on appeal before us. *Id.* at 1 n. 1.

Intervenors argue that we should address "the Secretary's decision not to apply the non-impairment policy to pre-1976 leases," Brief of Appellants-Intervenors at 64, claiming they will be collaterally estopped by the district court's judgment from contesting that policy in another forum. We decline Intervenors' invitation. The 1981 Opinion was issued after the trial court's opinion was rendered, and perforce was not before that court. The 1981 Opinion rejects the district court's rationale and is based instead upon an analysis of § 701(h). We are reversing and vacating all of the judgment below, holding that § 603(c)'s nonimpairment standard "remains the norm," 1981 Opinion at 4, with respect to *all* mineral leases *regardless* of their date of issuance. Accordingly, Intervenors will not be estopped from contesting in subsequent litigation what they perceive to be Interior's § 701(h) position. Whether § 701(h) saves a particular lease is an issue that is not before us.

gress sought to treat "mining and grazing uses," and "mineral leasing" differently, and the legislative history of the Act belies such a construction.

Most of section 603(c), including the non-impairment standard and the grandfather clause, was originally section 311 of H.R. 13777, 94th Cong., 2d Sess., 122 Cong.Rec. 23,465 (1976). The House Report on H.R. 13777 explained that while areas were under wilderness review, they were "to be managed in a manner to preserve their wilderness character, subject to continuation of existing grazing and *mineral uses* and appropriation under the mining laws." H.Rep. No. 1163, *supra,* at 17 (emphasis added), U.S.Code Cong. & Admin.News 1976, 6191. This language indicates that Congress intended only *existing* mining and grazing uses and *existing* mineral leasing activities to be exempted by the clause.

 It likewise appears obvious that all three protected activities are exempt to "the manner and degree in which [they were] being conducted on October 21, 1976." The nonimpairment standard and the grandfather clause originated in section 311 of H.R. 13777, and were enacted into law unchanged. The House Report contemplated that all three activities—grazing uses, mineral uses, and mining law appropriation—would generally be subject to the nonimpairment standard. *Id.* The legislative history of H.R. 13777's counterpart, S. 507, shows that the Senate had a similar intention. The analogous provisions in the Senate Bill, sections 102(a) and 103(d) of S. 507, 94th Cong. 2d Sess., 122 Cong.Rec. 4036 (1976), directed the Secretary to prepare an inventory of the public lands and to review areas containing wilderness characteristics. The review was "not, of itself, [to] change or prevent change in the management or use of the [lands under review]." *Id.* § 103(d). The Senate Report on S. 507 explained that the purpose of this language was

"to insure that ... the pattern of uses [would not] be frozen, or ... uses be automatically terminated.... On the other hand, the 'of itself' language [was]

not meant to be license to continue to allow or disallow uses as if no [review] processes were being conducted. The Committee fully expect[ed] that *the Secretary,* wherever possible, [*would*] make management decisions which will *insure that no future use* or combination of uses *which might be discovered as appropriate in the [review] process*—be they *wilderness,* grazing, ... *etc.*—[would] *be foreclosed by any use* or combination of uses *conducted after enactment* of S. 507, *but prior to* the *completion* of those processes."

S.Rep. No. 583, *supra,* at 44–45 (discussing identical language in § 102(a)). *See id.* at 46 (above discussion explicitly applied to construction of § 103(d)). Thus, Congress intended that no activity on the public lands following the Act's passage be allowed to degrade lands containing wilderness values on the date of enactment, precluding their consideration for wilderness suitability before the review process was concluded. A qualified exception to this policy decision was made for "mining and grazing uses and mineral leasing."

 We recognize that the statute itself uses the singular "was" rather than the plural "were" in the phrase "in the manner and degree in which the same was being conducted." FLPMA § 603(c). Therefore, an argument can be made that the "manner and degree" language was intended to apply only to "mineral leasing," and hence that mineral leasing was indeed to be treated differently from the other uses. However, this interpretation must be rejected because it is contradictory to the clause's purpose, as evidenced by the legislative history.

We note that both the nonimpairment standard and the grandfather clause originated in a predecessor bill to the FLPMA, H.R. 5441. They were added to insure that the Secretary would preserve the wilderness character of the lands under review, and "to keep the Secretary from changing anything" during the review period. Hearings on H.R. 5441 Before the Subcomm. on Public Lands of the House Comm. on Interi-

or & Insular Affairs, 93d Cong., 2d Sess. 1324 (1975), *quoted in* Solicitor's Opinion, *supra,* at 103. In its original form, the grandfather clause did not mention mineral leasing, but instead read "existing mining and grazing uses in the manner and degree in which the same *had been* conducted." *Id.* at 103–04 (emphasis added). The phrase was amended in committee on September 22, 1975 to read as it stands presently. There was no discussion concerning the addition of the "mineral leasing" term, or the change to "was." *See id.*

Because Congress intended the "manner and degree" language to refer both to mining and grazing uses, *Utah v. Andrus,* 486 F.Supp. 995, 1006 (D.Utah 1979); *see* H.Rep. No. 1163, *supra,* at 17; S.Rep. No. 583, *supra,* at 44–45, 46, *as well as* to mineral leasing, the use of the singular "was" rather than the plural "were" is clearly an error in grammar, and not a signal that mineral leasing was to be accorded different treatment. *See also* 1 U.S.C. § 1 (1976) (in interpreting congressional legislation, "words importing the singular include and apply to several persons or things").

■ Further evidence is available demonstrating that Congress is not always mindful of grammatical niceties. A few days prior to the FLPMA's enactment, Congress passed the Act of October 19, 1976, Pub.L. No. 94–557, 90 Stat. 2633 (reproduced at 16 U.S.C. § 1132 note (1976)). The two statutes are in pari materia; both involve WSAs and establish interim management standards, using strikingly similar language. Consequently, it is proper for us to look to the October 19th Act to aid us in our construction of the FLPMA. *See Erlenbaugh v. United States,* 409 U.S. 239, 243–44, 93 S.Ct. 477, 480, 34 L.Ed.2d 446 (1972); *see also Oscar Mayer & Co. v. Evans,* 441 U.S. 750, 756, 99 S.Ct. 2066, 2071, 60 L.Ed.2d 609 (1979) (where two statutes share a common purpose, their language is almost in haec verba, and legislative history shows that the later statute was patterned after the earlier, it is appropriate to construe the two together).

The October 19th Act designated several areas within national forest lands as "wilderness study areas," and directed the Secretary of Agriculture to administer them "to maintain their presently existing wilderness character and potential for inclusion in the [Wilderness System].... Already established *uses* may be permitted to continue ... in the manner and degree in which the same *was* being conducted on [October 19, 1976]." *Id.* § 3(d) (emphasis added). The House Report stated that established nonconforming uses could continue,

"such uses not to exceed the manner and degree of such uses on the date of enactment.... The term 'manner and degree' means not only types of uses, but implementation of controls to restrict such uses to the time, place and area where already occurring....

"Designation of a wilderness study area does not ... change already established mining, mineral leasing or grazing activities, in the manner and degree in which same *is* being conducted on date of enactment."

H.Rep. No. 1562, 94th Cong., 2d Sess. 18–19 (*reprinted in* 1976 U.S.Code Cong. & Ad. News 5876, 5893–94) (emphasis added).

In this Act, passed only two days before the FLPMA, Congress also used the singular verb "was" to refer to the plural noun "uses," providing evidence that the use of "was" in section 603(c) is similarly an error in drafting. We consider the October 19th Act, as explained by its legislative history, a persuasive indication of the kind and degree of protection Congress intended section 603(c) to afford to BLM Wilderness Study Areas.

■ The conclusion that Congress merely erred in its grammar is inescapable. "[A] provision which is the result of obvious mistake should not be given effect, particularly when it 'overrides common sense and evident statutory purpose.'" *United States v. Babcock,* 530 F.2d 1051, 1053 (D.C.Cir. 1976) (quoting *United States v. Brown,* 333 U.S. 18, 25, 68 S.Ct. 376, 380, 92 L.Ed. 442 (1948)). *See Berg v. Shannon (In re Shan-*

*non),* 670 F.2d 904, 906 (10th Cir.1982); *New York State Higher Education Services Corp. v. Adamo (In re Adamo),* 619 F.2d 216, 222 (2d Cir.1980), *cert. denied,* 449 U.S. 843, 101 S.Ct. 125, 66 L.Ed.2d 52 (1980). We will not pervert Congress' avowed intent and the manifest meaning of section 603(c). Instead, we conclude that mining and grazing uses and mineral leasing are to be treated identically under the section's grandfather clause, so as to effect the evident purpose of section 603. *See Chapman v. Houston Welfare Rights Organization,* 441 U.S. at 608, 99 S.Ct. at 1911.

The issue still remains whether Congress intended the phrase "mineral leasing" to refer to an activity of the Secretary or to development activities on mineral leases. The district court found that Congress meant to refer to the Secretary's administration of mineral leasing and the letting of leases. 500 F.Supp. at 1344. Appellants, however, argue that "mineral leasing" should be construed as referring to activity on leases.

The grandfather clause provides a limited exception to the nonimpairment standard for three types of activities: mining and grazing uses and mineral leasing. At first glance, this clause seems to refer to the Secretary's leasing program. Under this view, the clause appears to direct the Secretary to continue leasing in WSAs "in the manner *and degree* ... being conducted on October 21, 1976" (emphasis added). In this light, the language suggests that the Secretary is to continue to lease at *the same rate* as at enactment. However, mineral leasing has traditionally been a highly discretionary activity of the Secretary. It would be anomalous, to say the least, if Congress now were to constrict the Secretary's exercise of discretion in such an offhand and cursory manner.

In *Utah v. Andrus,* 486 F.Supp. 995 (D.Utah 1979), the district court examined the import of the grandfather clause as it pertained to mining in WSAs. Following an extensive review of the FLPMA and its legislative history, the court concluded that the clause protected mining and grazing uses to the extent that *actual* on-the-ground activity was taking place on October 21, 1976. The court determined that the statute referred to "*actual* uses, not merely a statutory right to use." *Id.* at 1006. Otherwise, "there is no way to give meaningful context to the 'manner and degree' language." *Id.* We agree with that court's interpretation; we believe that Congress intended to limit existing mining and grazing activities to the level of physical activity being undertaken on the FLPMA's date of enactment, and to regulate post-FLPMA activities so as to prevent impairment of wilderness characteristics. *See* H.Rep. No. 1163, *supra,* at 17; S.Rep. No. 583, *supra,* at 44. The purpose of the WSA management scheme is to maintain the status quo existing October 21, 1976, so that lands then suitable for wilderness consideration will not be rendered unfit for such consideration before the Secretary makes a recommendation and the Congress acts on the recommendation under section 603(a) and (b). *See Utah v. Andrus,* 486 F.Supp. at 1004–05; H.Rep. No. 1163 at 17; S.Rep. No. 583 at 44.

The House Report states that the grandfather clause covers only "existing grazing and *mineral uses* and appropriation under the mining laws." H.Rep. No. 1163, *supra,* at 17, U.S.Code Cong. & Admin.News 1976, 6191 (emphasis added). The report makes no reference to the Secretary's administration of the leasing program. This strongly suggests Congress meant "mineral leasing" to refer to actual development activity. In addition, the other two grandfathered activities are mining and grazing uses, referring to actual on-the-ground activity. "It is a familiar principle of statutory construction that words grouped in a list should be given related meaning." *Third National Bank v. IMPAC Ltd.,* 432 U.S. 312, 322, 97 S.Ct. 2307, 2313, 53 L.Ed.2d 368 (1977). *See also Jarecki v. G.D. Searle & Co.,* 367 U.S. 303, 307, 81 S.Ct. 1579, 1582, 6 L.Ed.2d 859 (1961) ("a word is known by the company it keeps").

Finally, we note that we are concerned here with a proviso to section 603, establish-

ing a limited exception to the nonimpairment standard. "In this regard, it is the general rule that a proviso should be strictly construed to the end that an exception does not devour the general policy which a law may embody." *Edward B. Marks Music Corp. v. Colorado Magnetics, Inc.,* 497 F.2d 285, 288 (10th Cir.1974), *cert. denied,* 419 U.S. 1120, 95 S.Ct. 801, 42 L.Ed.2d 819 (1975). Use of this canon here results in a construction of section 603 that comports with common sense.

One of the prime concerns of Congress in enacting the FLPMA was that BLM lands suitable for wilderness preservation at the date of the Act's passage be given a chance for consideration as wilderness. Under Interior's policy, the wilderness review period will result in only a brief hiatus from potential mineral development for most of the lands concerned. Lands containing oil and gas, and of no wilderness value, will be released from the review unharmed and fully suitable for mineral development. Under RMOGA's interpretation, however, lands suitable for wilderness could be irrevocably altered by development and their wilderness values destroyed. It would be incongruous to limit mining and grazing to pre-FLPMA levels, but give disruptive mineral leasing activities carte blanche.

In light of the language of section 603(c) and its legislative history, we hold that Interior's interpretation of the section's effect on mineral leasing activities, as expressed in the Solicitor's Opinion of September 5, 1978, is reasonable and entitled to deference. Indeed, under our analysis it is compelling. We hold that mineral leasing is subject to the nonimpairment standard of section 603(c), and that the grandfather clause affords protection only to activities on mineral leases in the manner and degree actually occurring on October 21, 1976. We reverse the district court's opinion, and remand for the entry of judgment in accordance with this opinion.